FILED'10 APR 21 15:53USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LINDA ALEXANDER,                                        Civil No. 09-6091-CL

       Plaintiff,                              REPORT AND RECOMMENDATION

          v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

       Defendant.


CLARKE, Magistrate Judge.

       Plaintiff Linda Alexander brings this action pursuant to section 405(g) of the Social

Security Act to obtain judicial review of a final decision of the Commissioner denying her

application for disability insurance benefits ("DIB"). For the reasons explained, I affirm the

decision of the Commissioner.

## DISABILITY ANALYSIS

       The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

2 - REPORT AND RECOMMENDATION

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational

3 - REPORT AND RECOMMENDATION

interpretation, we must defer to the Commissioner's decision." <u>Batson v. Barnhart</u>, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The Administrative Law Judge ("ALJ") found that Alexander had severe impairments of mood disorder and degenerative disc disease of the cervical and lumbar spine without nerve encroachment. The ALJ also found that these impairments, either singly or in combination, were not severe enough to meet or medically equal the requirements of any of the impairments listed in Appendix 1, Subpart P of the Social Security Regulations. After reviewing the medical record, the ALJ concluded that Alexander had the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk six hours in an eight hour workday; and sit six hours in an eight hour workday. In addition, the ALJ found that Alexander is limited to occasional climbing of ladders, scaffolding and ropes; crawling; and overhead reaching. Finally, the ALJ found that Alexander is precluded from sustained concentration on detailed tasks. Based on the above findings, the ALJ concluded that Alexander had the residual functional capacity ("RFC") to perform her past relevant work as a telemarketer.

## FACTS

At the time of her hearing, Linda Alexander was a 47-year-old woman with a ninth grade education. Until 2005, she had worked for a decade with an autistic man in a mental health facility. Prior to that job, Alexander worked briefly as the assistant manager at a telemarketing firm. Finally, at one time Alexander also operated an adult foster home for a time. Alexander has been married three times, but is currently single.

She claims she has been disabled since December 22, 2005, when she quit her job because she was in so much pain that she "couldn't take it anymore." Tr. 19. According to Alexander, the pain was "[i]n my shoulders, up my neck. I would get muscle spasms that were pretty much on either side of my spine." Tr. 21. Alexander reported that she first injured her neck in 1996, and that it had been reinjured and aggravated when the autistic man she cared for pulled her hair. In recent years, Alexander has also experienced pain in her lower spine. She describes it as "like you've been bent over for eight hours and all of a sudden you had to straighten up." Tr. 34. Alexander testified that she cannot sit at a computer because "[i]t just starts burning and, and tearing, and muscle spasms." Tr. 25. She testified "the pain was so bad I couldn't deal, just couldn't do it." Tr. 21.

To treat her symptoms, Alexander has taken a variety of different prescription drugs over the years, including Percocet, Methadone, Vicodin, medical marijauna, amitriptyline, Neurontin, Paxil, Flexeril, and Soma.

Medical records reveal that prior to applying for social security, Alexander had "at least three claims relating to her neck in the past," dating back as far as 1996. Tr. 243. Since that time, she has regularly visited her primary care physician and emergency rooms for pain complaints associated with her neck. Yet the vast majority of the medical records reveal doctors who are unable to make objective findings that match Alexander's subjective complaints.

In May 2005, Dr. Richard Alley wrote in Alexander's Physical Residual Functional Capacity Report that "[a] lot of the allegations are not supported by objective findings." Tr. 269. In December 2005, Dr. Stephan Schepergerdes, the claimant's primary care physician, reported that Alexander "has always had hypersensitive type pain examination . . . [and] even with initial

5 - REPORT AND RECOMMENDATION

light touch of one hand to the forehead to get ready to balance her head while I am examining the neck. She already winces." Tr. 248. In October 2007, Dr. Schepergerdes wrote "I believe that the patient has exaggerated pain response to right shoulder today." Tr. 364. A psychologist who examined Alexander, Dr. Gail Wahl, Ph.D., also wrote that "[t]here is evidence of exaggeration or malingering." Tr. 276. Similarly, in the Mental RFC Assessment, Dr. Dorothy Anderson, Ph.D. wrote that "[o]bjective findings does not [*sic*] support level of disability alleged." Tr. 291.

On May 18, 2006, Alexander went to see an orthopedic surgeon, Dr. Michael Marble, for an extensive evaluation. After conducting a longitudinal review of Alexander's medical records dating back to 1996, and after giving Alexander his own examination, Dr. Marble drafted a fifteen-page report about Alexander's neck pain. He wrote that "[t]here is no organic pathology that, in my judgment, explains her persistent complaints of pain." Tr. 314. "This patient has consistently had little in the way of objective physical findings beyond limitation of motion in the neck and tenderness on palpation." Tr. 315. "The imaging studies that I have been able to review do not document a severe state of degeneration at any level in her neck." Tr. 316. "In short, there is simply no way for me to explain, on an anatomical basis, either the longevity or the apparent severity of this patient's pain." Tr. 318.

Dr. Marble also noted that he "found no evidence of objective pathology that would preclude her from working," and that "overall, I think her situation will be better if she is actively employed." Tr. 317. On February 8, 2008, Dr. Schepergerdes wrote that "[i]t is very difficult to tell what her true work capacity might be and if insurance wants this verified, it may come down to a functional capacity exam." Tr. 362.

Alexander also has a history of depression. On June 13, 2006, Alexander saw Dr. Gail Wahl, Ph.D. for a comprehensive psychodiagnostic evaluation. Dr. Wahl noted that Alexander has "had problems with depression secondary to her neck pain." Tr. 274. During the evaluation, Alexander "cried frequently, particularly if anything was discussed about her neck." Tr. 276. Dr. Wahl diagnosed Alexander with Major Depressive Disorder secondary to chronic pain, and cannabis dependence. Commenting on the connection of her mental and physical ailments, Dr. Schepergerdes once commented that "she seems to have good and bad days and the depression itself worsens her pain symptoms." Tr. 244. Despite a long history of depression, Alexander has never been to see a counselor for her psychological problems.

Aside from her depression, Dr. Wahl noted that "[t]his individual is capable of understanding and remembering instructions. No problems were determined with her concentration, attention and persistence and she is able to engage in socially appropriate interaction." Tr. 277. Dr. Anderson also opined that Alexander is "[a]ble to understand, remember and carry out both simple and detailed tasks but due to depression would not be able to sustain concentration consistently on detailed tasks." Tr. 295.

At home, Alexander is mostly able to function independently. She testified that she vacuums her house, but needs to take a break after about ten minutes of doing so. Tr. 24-5. She "does her own chores such as laundry and groceries, but paces herself." Tr. 364. She changes the sheets on her own bed, although she testified that "[i]t takes all day." Tr. 36. She also drives herself to and from medical appointments, and occasionally gardens. Alexander also "has a dog that . . . is the light of her life and [she] can care for him." Tr. 275. She handles her own finances and enjoys going to garage sales.

7 - REPORT AND RECOMMENDATION

Alexander also has an active social life. She drives to visit friends in Eugene a couple times per month, and sees her friend Trudy Morris every day. When they get together they "[t]alk about [their] pain. [Morris]'s got pain too," and is also seeking social security. Tr. 36. Morris testified that Alexander "can't vacuum" and "she's come over to the house just in tears. She was, she hurts so bad when she couldn't move." Tr. 41. Morris also testified that Alexander's "mother comes over and helps her with housework." Tr. 41. Alexander also remains close with her sister Nancy Wallwork who wrote a letter indicating that "Linda does not walk, talk, or sit without pain." Tr. 190. Alexander's former co-worker and friend Liz Smart wrote that "the changes that have occurred in her health have been devastating," and that she used to love her job and work 60 hours per week. Tr. 191.

## DISCUSSION

Alexander contends that the ALJ erred (1) by not giving sufficient reasons to reject the Plaintiff's testimony, (2) by not giving sufficient reasons to reject key lay witness testimony, and (3) because the ALJ's finding regarding Alexander's RFC were inconsistent with the requirements of Alexander's past relevant work as a telemarketer. I address each contention in turn.

I.     Alexander's Pain Testimony

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." Id.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Here, it is arguable whether Alexander met her burden of producing objective medical evidence of her impairments, but there is no question that the ALJ gave clear and convincing reasons to reject Alexander's testimony as to the severity of her pain. The ALJ found that Alexander was not fully credible because of the disparity between her reports and the findings of her medical providers. See Tr. 64.

Alexander's testimony, in general, is that her pain is so severe that she cannot work, and that only a combination of Methadone and medical marijuana give her any degree of comfort. Yet, as set forth above, the relatively short record is replete with medical analyses that find no objective corroboration for the severity of Alexander's complaints. Dr. Alley found that "[a] lot of the allegations are not supported by objective findings." Dr. Schepergerdes noted that Alexander winced before he even touched her neck for examination. Dr. Wahl found evidence of exaggeration or malingering. Dr. Anderson found that the objective findings did not support the level of disability alleged. Dr. Marble wrote that "there is simply no way for me to explain, on an

anatomical basis, either the longevity or the apparent severity of this patient's pain," and that he "found no evidence of objective pathology that would preclude her from working."

Although the ALJ cannot completely reject Alexander's subjective pain testimony based on its less than full corroboration by her doctors' objective medical evidence, such evidence is still relevant in determining the extent of her pain and its disabling effects. The ALJ does not state that Alexander is completely incredible or experiences no pain at all. On the contrary, the ALJ's holding is merely that Alexander's pain does not make her disabled. Based on the record, I tend to agree.

II.    Lay Witness Testimony

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Commissioner of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). A medical diagnosis, however, is beyond the competence of lay witnesses. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). A legitimate reason to discount lay testimony is that it conflicts with medical evidence. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

"[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, the ALJ "considered the third-party statements and the testimony of Ms. Morris." Tr. 66. The ALJ gave the statements minimal weight, however, because the lay witness

testimony conflicted with the medical evidence in the record and because the testimony was

primarily based on Alexander's statements regarding the severity of her pain. The conflict

between the medical evidence and lay witness testimony is a germane reason to reject the lay

witness testimony.

In addition, some of the lay witness testimony is contradictory. For example, Trudy

Morris, the only lay witness who testified about her direct daily observations of Alexander,

testified that Alexander "can't vacuum." Yet Alexander testified that she vacuums her own

house, but needs to take breaks. Morris also testified that "she's come over to the house just in

tears" and "she hurts so bad . . . she couldn't move." The two sentences are in direct conflict with

one another because in order to come over Alexander had to move.

In any event, to the extent the ALJ failed to properly discuss and credit the lay witness

testimony, I am confident that no reasonable ALJ, giving full credit to the lay witness testimony,

could have reached a different disability determination. Therefore, to the extent the ALJ erred, it

was harmless.

III.    Vocational Expert Testimony

Hypothetical questions posed to a vocational expert ("VE") must specify all of the

limitations and restrictions of the claimant. Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir.

2001). If the hypothetical does not contain all of the claimant's limitations, the expert's

testimony has no evidentiary value to support a finding that the claimant can perform jobs in the

national economy. Id.

Here, in the ALJ's hypothetical to the VE, the ALJ said, "she should have no sustained

concentration for detailed tasks. She can do detailed tasks but she can't sustain concentration for

—

a long period to do a detailed task." Tr. 44-5. Based on this limitation, the VE testified that the

claimant could be employed as a telemarketer. The VE then gave the Dictionary of Occupational

Titles ("DOT") number for the telemarketer job incorrectly. Later, on cross-examination,

Alexander's counsel asked the VE "does the telemarketer job require focus or the ability to

sustain attention throughout a workday?" Tr. 48. The VE responded "[i]t's, I mean it's simple

work, meaning it's entry level work, but there is some concentration, yes." Tr. 48.

 Alexander contends that because the VE gave the wrong DOT number, and because the

telemarketer requires level three reasoning ability, as defined by the DOT, the ALJ's decision was

internally inconsistent and not based on substantial evidence. According to Alexander, level

three reasoning requires someone who can deal with problems involving several concrete

variables in and from standardized instructions. Pl. Opening Br. at 12. Alexander implicitly

reasons that a person who is unable to sustain concentration for a long period to do a detailed

task is a person who does not possess level three reasoning capability. I disagree.

 Alexander is correct that level three reasoning requires that an employee be able to

"[a]pply commonsense understanding to carry out instructions furnished in written, oral, or

diagrammatic form. Deal with problems involving several concrete variables in or from

standardized situations." DOT, Appendix C. But an inability to sustain concentration over a

long period of time does not negate a person's ability to apply commonsense understanding to

instructions or deal with a few variables in standardized situations. These are distinct ideas.

 Moreover, the ALJ and the vocational expert are not bound by the DOT's characterization

of occupations because the Social Security regulations do not obligate them to rely on the DOT's

12 - REPORT AND RECOMMENDATION

classifications. <u>Wright v. Massanari</u>, 321 F.3d 611, 616 (9th Cir. 2003). The ALJ is entitled to rely on the testimony of the vocational expert in reaching a decision. <u>Id.</u>

In sum, I find that substantial evidence supports the ALJ's findings and decision.

**RECOMMENDATION**

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be affirmed.

*<u>This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals</u>*. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *<u>Objections to this Report and Recommendation, if any, are due by May 10, 2010. If objections are filed, any response to the objections are due by May 27, 2010,</u>* *see* Federal Rules of Civil Procedure 72 and 6.

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this ___2 /___ day of April, 2010.

_____
MARK D. CLARKE
United States Magistrate Judge

13 - REPORT AND RECOMMENDATION